IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. ____________________

ERIC POWELL, an individual; and RICHARD GRAY, an individual,

Plaintiffs,

v.

DIXON LAW, a Maryland limited liability company; and ERIC DIXON, an individual,

Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Eric Powell ("Mr. Powell") and Richard Gray ("Mr. Gray," together with Mr. Powell, the "Plaintiffs"), by and through their counsel, the Ito Law Group, P.C., file this Complaint and Jury Demand alleging as follows:

## I.

## INTRODUCTION

1. This is an action against Dixon Law, LLC ("Dixon Law") and attorney Eric Dixon ("Mr. Dixon") seeking damages for acts of legal malpractice and professional negligence.

2. Ratio Clothing, LLC ("Ratio") was a custom closing business owned and operated by the Plaintiffs in Denver, Colorado. In early 2022, Plaintiffs entered into discussions with Fan Bi ("Mr. Bi") for the sale of Plaintiffs' membership interest in Ratio.

3. Mr. Bi was the founder and chief executive officer of Blank Label Group, Inc. ("Blank Label Group"), a similar custom clothing business operated by Mr. Bi in Boston, Massachusetts. Mr. Bi, by and through Blank Label Group, had recently acquired another custom clothing business (with a confusingly similar name), BlackLapel Custom Clothiers, Inc. ("BlackLapel"), and was looking to expand their presence by targeting other smaller/regional custom clothing brands such as Ratio.

4. Plaintiffs retained Dixon Law and Mr. Dixon to advise them on the sale of their membership interest.

5. The proposed sale included an initial cash payment of $100,000, and a deferred payment of $325,000 plus additional payments of principal equal to 8% of Ratio's net revenue up to a maximum principal amount of $625,000. The terms of the deferred payment and net revenue were to be represented in promissory notes issued in favor of Plaintiffs.

6. The payments owing to Plaintiffs under the promissory notes were to be secured by assets owned by BLG Holdings, LLC ("BLG"), the buyer of the

Membership Interest, along with the assets of Ratio, BlackLapel, and Blank Label Group.

7. In an event of a default by BLG under the promissory notes, Plaintiffs could look to the assets (e.g., collateral) owned by BLG, Ratio, BlackLapel and Blank Label Group to make them whole.

8. Dixon Law and Mr. Dixon, on behalf of Plaintiffs, were charged with ensuring that the assets owned by BLG, Ratio, BlackLapel and Blank Label Group were properly pledged to Plaintiffs so that in the event of a default Plaintiffs could exercise their legal rights and remedies under the law to foreclose on the assets.

9. In January 2023, BLG defaulted under the terms of the promissory notes thereby triggering a default.

10. Then in March 2023, BlackLapel, Blank Label Group and Ratio filed for bankruptcy in Delaware.

11. The only action taken by Dixon Law and Mr. Dixon to ensure that the assets owned by BLG, Ratio, BlackLapel and Blank Label Group were properly pledged to Plaintiffs was to file a UCC-1 financing statement in Delaware.

12. The UCC-1 financing statement filed in Delaware by Dixon Law and Mr. Dixon listed only BLG as the "debtor."

13. For the reasons explained below, the UCC-1 financing statement filed by Dixon Law and Mr. Dixon was deficient in multiple ways and failed to ensure

that the assets owned by Ratio, BlackLapel and Blank Label Group were properly pledged to Plaintiffs.

14. Ultimately, the assets of Ratio, BlackLapel and Blank Label Group were sold pursuant to a sale overseen by the bankruptcy court in Delaware. As a direct result of the negligence of Dixon Law and Mr. Dixon, Plaintiffs were left without any remedy under the law to foreclose on the assets that they believed had been pledged to them by Ratio, BlackLapel and Blank Label Group. As a direct result of the negligence of Dixon Law and Mr. Dixon, Plaintiffs were left without the ability to "credit bid" the amount of their claim against the assets being sold by Ratio, BlackLapel and Blank Label Group.

15. As a direct result of the negligence of Dixon Law and Mr. Dixon, Plaintiffs had no ability to recover the assets they believed had been pledged in their favor and no ability to recover the proceeds from the sale of those assets.

## II.

## THE PARTIES

16. Plaintiff, Mr. Powell, is an individual residing in the State of Colorado.

17. Plaintiff, Mr. Gray, is an individual residing in the State of California.

18. Defendant Dixon Law is a Maryland limited liability company.

19. The sole member of Dixon Law is Mr. Dixon.

20. Defendant, Mr. Dixon, is an individual residing in the State of Maryland.

## III.

## JURISDICTION AND VENUE

21. This Court has jurisdiction under 28 U.S.C. § 1332 because there is a diversity of citizenship between Plaintiffs, Mr. Powell and Mr. Gray, and Defendants, Dixon Law and Mr. Dixon, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

22. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred in the State of Colorado.

## IV.

## BACKGROUND

### A. Ratio Clothing, LLC

23. At all relevant times, Ratio was an Ohio limited liability company.

24. At all relevant times, Ratio was a custom clothing company based in Denver, Colorado. Ratio manufactured custom fit dress shirts, business casual shirts, causal shirts and formal shirts, and custom suits. Customers could shop online or in Ratio's Denver showroom.

25. At all relevant times, Mr. Powell owned 84.71% of Ratio.

26. At all relevant times, Mr. Gray owned 15.29% of Ratio.

**B. Sale of Ratio to BLG Holdings, LLC**

27. In April 2022, Plaintiffs engaged Dixon Law and Mr. Dixon to represent them in the sale and transfer of their one-hundred percent (100%) membership interest ("Membership Interest") in Ratio. BLG was ultimately identified as the buyer of the Membership Interest.

28. BLG was part of a corporate structure that operated two other custom clothing businesses, BlackLapel and Blank Label Group. Mr. Bi owned and controlled BLG, BlackLapel and Blank Label Group.

29. Dixon Law's and Mr. Dixon's representation of Plaintiffs included the preparation of documents that reflected the financial terms of the transaction, including the consideration to be paid, the terms under which BLG would pay, and to secure the payment of that consideration.

30. The consideration included $100,000 paid upon the initial transfer of the Membership Interest, and a deferred payment of $325,000 on terms that were to be represented in "Secured Promissory Notes" ("Notes") issued by BLG to Plaintiffs.

31. The Notes also contained provisions for additional payments of principal equal to 8% of Ratio's "Net Revenues" earned between October 1, 2025 and September 20, 2030 up to a maximum of $300,00 in additional note payments for a total of $625,000.

32. Upon an "Event of Default," the Notes provided that the amount owing by BLG to Plaintiffs would be $625,000, which would immediately become due and payable. Upon an "Event of Default," the Notes further provided for "Default Interest." "Default Interest" under the Notes is defined as "the rate of 8% per quarter for the remaining term of the Note, until paid in full." Default Interest is payable from and after an Event of Default.

33. The transaction was ultimately consummated by the signing of a Share Purchase Agreement ("Share Purchase Agreement") between Plaintiffs and BLG dated June 15, 2022.

34. Plaintiffs relied upon Dixon Law and Mr. Dixon to, among other things, review, draft and implement proposed measures to ensure payment of the Notes.

35. According to the Recitals to the Share Purchase Agreement, BLG was to sign and deliver a security agreement which would grant "a lien on all assets of the Company [Ratio] and the Buyer, subject to Sellers' security interest, in order to secure payment of the Purchase Price."

36. The Share Purchase Agreement also stated that "[t]he Purchaser's obligation to pay the Purchase Price shall be secured by the a [sic] UCC-1 Financing Statement secured by both the assets of the Buyer and the Company" as well as "[a]s further security for the payment of the Purchase Price, Buyer hereby

grants to Seller, a continuing first-priority security interest in and to all of Buyer's right, interest and title in and to the Purchased Shares."

37. BLG's obligations at the closing of the transaction included signing and delivering a Security Agreement ("Security Agreement"), the form of which was set forth in Exhibit B to the Share Purchase Agreement.

38. The initial draft of the Security Agreement provided only for a security interest in the assets of Ratio.

39. According to Recital B of the initial draft of the Security Agreement, Plaintiffs would receive "a second-lien security interest in all of the assets of Ratio Clothing, LLC."

40. Dixon Law and Mr. Dixon advised, counseled and recommended to Plaintiffs that the security interest be expanded to include not just Ratio but also BLG, BlackLapel and Blank Label Group.

41. In reliance upon the advice, counsel and recommendation of Dixon Law and Mr. Dixon, Plaintiffs agreed to expand the security interest to include BLG, BlackLapel and Blank Label Group.

42. In accordance with their legal advice and counsel, Dixon Law and Mr. Dixon revised Recital B of the initial draft of the Security Agreement to provide that Plaintiffs would receive "a second-lien security interest in all of the assets of (i) the Grantor [BLG], and (ii) all subsidiaries of Grantor, including Blank Label

Group, Inc. a Delaware corporation ("OpCo") and Ratio Clothing, LLC, an Ohio limited liability company (the "Company")."

43. The final version of the Security Agreement provided in Recital B that Plaintiffs would receive a lien against all of the assets of BLG, BlackLapel, Blank Label Group and Ratio. To wit, the Security Agreement that was signed by Plaintiffs, on the one hand, and BLG, on the other, provided that BLG, as the "Grantor," had:

> Agree[d] to grant a second lien security interest in all of the assets of (i) the Grantor, and (ii) all subsidiaries of Grantor, including Blank Label Group, Inc. a Delaware corporation ("OpCo") and Ratio Clothing, LLC, an Ohio limited liability company (the "Company").

44. Recital B of the Security Agreement described the security as:

> Including its personal property, whether presently existing or hereafter created or acquired, including, without limitation, all accounts, chattel paper, documents, instruments, money, deposit accounts, general intangibles (including all returns, repossessions, books and records relating thereto, and equipment containing such books and records, as well as Grantor's technology, technological know-how, copyrights, trade secrets, patents, licenses, and other intellectual property rights), investment property (including all securities and securities entitlements), goods (including all equipment and inventory), and all proceeds of the foregoing (including insurance proceeds) (collectively, the "Collateral").

45. The grant contained in Recital B was effected by § 1.1 of the Security Agreement. It provided that "[t]o secure timely and full payment under the Note,

Grantor hereby grants to each Secured Party a second-lien security interest in the Collateral."

**C. The Agreed Collateral**

46. In accordance with their advice, recommendation and counsel that Plaintiffs' security interest should be expanded to include Ratio, BLG, BlackLapel and Blank Label Group, Dixon Law and Mr. Dixon, on behalf of Plaintiffs, were charged with ensuring that Plaintiffs received a valid and perfected security interest in each of the following (collectively, the "Agreed Collateral"):

a. the Membership Interest;

b. all assets of Ratio (the "Ratio Assets");

c. all equity interest in BlackLapel and Blank Label Group and BlackLapel (the "Subsidiary Equity Interests"); and

d. all assets of BlackLapel and Blank Label Group (the "Subsidiary Assets").

**D. The Financing Statement**

47. On June 27, 2022, twelve days after the closing, Dixon Law and Mr. Dixon caused a UCC-1 financing statement (the "Financing Statement") to be filed with the Delaware Department of State's office.

48. The Financing Statement listed BLG as the only "debtor," and described the collateral as:

> All of the assets of (i) the Debtor [BLG], and (ii) all subsidiaries of Debtor (including Blank Label Group, Inc., a Delaware corporation and Ratio Clothing, LLC, an Ohio limited liability company), subject to the the [*sic*] U.S. Small Business Administration's lien dated June 28, 2020, including their respective personal property, whether presently existing or hereafter created or acquired, including, without limitation, all accounts, chattel paper, documents, instruments, money, deposit accounts, general intangibles (including all returns, repossessions, books and records relating thereto, and equipment containing such books and records, as well as Debtor's technology, technological know-how, copyrights, trade secrets, patents, licenses, and other intellectual property rights), investment property (including all securities and securities entitlements), goods (including all equipment and inventory), and all proceeds of the foregoing (including insurance proceeds) (collectively, the "Collateral").

49. The Financing Statement prepared and filed by Dixon Law and Mr. Dixon failed to list BlackLapel and Blank Label Group as "debtors."

50. No other filings were made by Dixon Law and Mr. Dixon on behalf of Plaintiffs with any public authority in any state in 2022.

**E. Default by BLG**

51. Less than six months after the sale of the Membership Interest, Mr. Powell learned that the principal behind BLG, Mr. Bi, intended to market and sell Ratio and other assets.

52. A month later, Mr. Bi informed Mr. Powell that the BLG group of companies were in financial distress and were retaining a restructuring attorney.

53. On January 31, 2023, BLG missed the first required payment under the Notes thereby giving rise to an Event of Default under the Notes.

54. Mr. Powell notified Dixon Law and Mr. Dixon of a potential bankruptcy proceeding and the likely sale of the assets that Plaintiffs believed served as collateral for the Notes.

55. On February 17, 2023, nearly eight months after the sale was consummated, Dixon Law and Dixon filed a UCC-1 financing statement (the "Ratio Financing Statement") against Ratio in Ohio, and amended the Financing Statement ("Amended Financing Statement") in Delaware to include BlackLapel and Blank Label, Inc. ("Blank Label, Inc.") as "debtors."

56. Plaintiffs are informed and believe and thereon allege that there is no entity known as Blank Label, Inc. associated with Ratio, BLG, BlackLapel or any of their respective subsidiaries or parent companies.

**F. The Bankruptcies**

57. On March 8, 2023, BlackLapel, Ratio and Blank Label Group (collectively, the "Debtors") each filed chapter 11 cases in Delaware. The cases were jointly administered with the Blank Label Group case.

58. BLG was not included in the bankruptcy filings.

59. No entity named "Blank Label, Inc." was included as part of the bankruptcy filings.

60. After filing, the Debtors proposed a sale free and clear of all Debtors' assets under Section 363 of the federal Bankruptcy Code.

61. On May 15, 2023, an auction was held for the assets of the Debtors.

62. H.M. Cole was the winning bidder despite efforts by Plaintiffs to bid for the assets of Ratio.

63. The winning bid provided for an aggregate purchase price of $1,250,000 for the assets of all three Debtors. This price was allocated as follows: (i) $200,000 for the assets of Ratio; (ii) $700,000 for the assets of BlackLapel; and (iii) $200,000 for the assets of Blank Label Group. The remaining part of the purchase price was allocated to a "Maintenance Fee" of $150,000, $100,000 of which was to be paid to Mr. Bi.

64. On May 23, 2023, the bankruptcy court approved the sale, and ordered that all cash proceeds were to be deposited in escrow pending further court approval, and were to remain subject to all valid liens, claims and encumbrances.

65. The sale closed and the consideration was paid on May 31, 2023, with the proceeds placed in escrow.

66. On December 7, 2023, Blank Label Group confirmed its plan of reorganization ("Plan"). Among other things, the Plan substantively consolidated (i.e., merged) all Debtors into one entity, and canceled BLG's equity interest in Ratio.

## G. BLG's Ownership Structure

67. During the course of the negotiation of the Share Purchase Agreement, Dixon Law and Mr. Dixon assumed based on representations made by Mr. Bi and his representatives that BLG was the holding company for all of Mr. Bi's related entities.

68. Dixon Law and Mr. Dixon assumed based on representations made by Mr. Bi and his representatives that BLG owned all the ownership interests in Blank Label Group and BlackLapel, and would own the Membership Interest in Ratio purchased from Plaintiffs.

69. Section 4.01(b) of the Share Purchase Agreement reflects these assumptions and representations.

70. These assumptions proved to be false.

71. BLG was not the main holding company.

72. BLG was not the parent company of Blank Label Group.

73. Instead, Blank Label Group was the holding company for BLG and BlackLapel.

74. At of the time the Share Purchase Agreement was signed, Blank Label Group held all of the equity and membership interests in BlackLapel and BLG. When BLG ultimately acquired the Membership Interest in Ratio under the Share Purchase Agreement, Ratio was a second-level subsidiary of Blank Label Group.

**H. Dixon Law and Mr. Dixon Served as Legal Counsel to Plaintiffs**

75. In April 2022, Plaintiffs engaged Dixon Law and Mr. Dixon to represent them in the sale and transfer of their Membership Interest in Ratio.

76. At all relevant times, Mr. Powell, who resided in Colorado, was the sole point of contact for Dixon Law and Mr. Dixon. On behalf of Mr. Gray and himself, Mr. Powell was the primary point of contact for Dixon Law and Mr. Dixon. Communications between Mr. Powell, on the one hand, and Dixon Law and Mr. Dixon, on the other, were conducted either via email with Mr. Powell writing from his residence in Colorado, by video conference with Mr. Powell appearing from his residence in Colorado, or by telephone with Mr. Powell participating on the call from his residence in Colorado.

77. The engagement of Dixon Law and Mr. Dixon was memorialized in a letter dated April 1, 2022 ("Engagement Letter").

78. The Engagement Letter provided, in relevant part, as follows:

> Dixon Law, LLC ("we," "us" or "Dixon Law") is pleased that we have been engaged to assist Ratio Clothing, LLC (the "Company") in connection with the potential sale of the Company. You should understand that we are going to represent only the Company and will not be able to represent any founder's or other owner's interest (including any individual's interest as a founder, stockholder or executive of the Company) separately.

79. Mr. Dixon prepared the Engagement Letter for Mr. Powell's signature as Chief Executive Officer of Ratio. Mr. Powell signed the Engagement Letter in Colorado.

80. Although the Engagement Letter was between the Dixon Firm and Mr. Dixon, on the one hand, and Ratio, on the other, in reality Dixon Law and Mr. Dixon provided legal advice and counsel to Plaintiffs.

81. On or about April 5, 2022, Mr. Powell emailed Mr. Dixon a document titled "Stock Purchase Agreement between Eric Powell and The Blank Label Group, LLC" (the "Draft Stock Purchase Agreement"). The Draft Stock Purchase Agreement refers to Mr. Powell and Mr. Gray as the owners of 85% and 15%, respectively, of Ratio.

82. If Dixon Law and Mr. Dixon did not already appreciate that the sale of Ratio was being structured as a sale of the Membership Interest as opposed to an asset sale, Mr. Dixon knew by April 5, 2022 or soon thereafter after he reviewed the Draft Stock Purchase Agreement.

83. A reasonable lawyer would have known at the that time that Plaintiffs required legal representation for the sale of their Membership Interest.

84. A reasonable lawyer would have known that Ratio did not itself require legal representation because it was not a party to the Draft Stock Purchase Agreement.

85. If Dixon Law and Mr. Dixon did not want to represent Plaintiffs in the sale of their Membership Interest, this would have been the opportunity for Dixon Law and Mr. Dixon to withdraw from their representation.

86. Instead of withdrawing, Dixon Law and Mr. Dixon proceeded to give Plaintiffs legal advice and represented Plaintiffs in negotiating the sale of their Membership Interest.

87. Plaintiffs understood and believed that Dixon Law and Mr. Dixon was their legal counsel as they were soliciting legal advice in regard to the sale of their Membership Interest, and Dixon Law and Mr. Dixon provided them with that legal advice.

88. The course of conduct between Plaintiffs, on the one hand, and Dixon Law and Mr. Dixon, on the other, is consistent with and indicative of an attorney-client relationship between Plaintiffs, on the one hand, and Dixon Law and Mr. Dixon, on the other.

89. The Security Agreement called for the grant of a security interest in, among other things, the assets of Ratio. As such, the interests of Ratio were adverse to the interests of Plaintiffs.

90. Under Colorado Rule of Profession Conduct 1.13, if Dixon Law and Mr. Dixon believed that the client was Ratio, then Dixon Law and Mr. Dixon had

an ethical duty to advise Plaintiffs that they represented only Ratio. Dixon Law and Mr. Dixon never advised Plaintiffs that they represented only Ratio.

91. That Dixon Law and Mr. Dixon never advised Plaintiffs that they represented only Ratio is consistent with the practical reality that Dixon Law and Mr. Dixon gave legal advice to Plaintiffs and acted as their lawyer for purposes of the sale of their Membership Interest.

92. If Dixon Law and Mr. Dixon believed that they were representing only Ratio, not only was their conduct violative of Colorado Rule of Professional Conduct 1.13, but it was also contrary to the reasonable expectations of Plaintiffs and inherently misleading.

93. In fact, Dixon Law and Mr. Dixon provided legal advice to and represented Plaintiffs with the negotiation of their agreement to sell their Membership Interest to BLG through closing in June 2022.

94. After closing of the sale of the Membership Interest to BLG, Dixon Law and Mr. Dixon continued to advise and represent Plaintiffs in relation to the security interests that collateralized the deferred payments owing to them pursuant to the Notes.

95. On January 31, 2023, Dixon Law and Mr. Dixon prepared a second engagement letter (the “Second Engagement Letter”).

96. The Second Engagement Letter provided, in relevant part, as follows:

> Dixon Law, LLC ("we," "us" or "Dixon Law") is pleased that we have been engaged to [sic] you (the "Client") in connection with post-closing matters related to the sale of Ratio Clothing, LLC.

97. Mr. Dixon prepared the Second Engagement Letter for Mr. Powell's signature. Mr. Powell signed the Second Engagement Letter in Colorado.

98. Pursuant to the Second Engagement Letter, Plaintiffs understood and believed that Dixon Law and Mr. Dixon was their legal counsel as they were soliciting legal advice in regard to enforcing their rights under the Notes given that BLG missed the first required payment under the Notes on January 31, 2023, which is the same date as the Second Engagement Letter.

99. The course of conduct between Plaintiffs, on the one hand, and Dixon Law and Mr. Dixon, on the other, is consistent with and indicative of an attorney-client relationship between Plaintiffs, on the one hand, and Dixon Law and Mr. Dixon, on the other.

100. If Dixon Law and Mr. Dixon had represented Ratio in the transaction with BLG then the subsequent representation of Mr. Powell pursuant to the Second Engagement Letter would have been violative of Colorado Rule of Professional Conduct 1.9.

101. Pursuant to Colorado Rule of Professional Conduct 1.9, the representation by Dixon Law and Mr. Dixon of Mr. Powell in post-closing matters

adverse to Ratio would have given rise to a conflict of interest since Ratio would have been considered to be a former client of Dixon Law and Mr. Dixon.

102. Dixon Law's and Mr. Dixon's post-closing conduct is consistent with their continued attorney-client relationship and representation of Plaintiffs that commenced no later than April 5, 2022.

103. As legal counsel for Plaintiffs, Dixon Law and Mr. Dixon owed a duty of care to Plaintiffs to exercise the competence and diligence normally exercised by lawyers in similar circumstances.

## I. Breaches of Standard of Care by Dixon Law and Mr. Dixon

104. Dixon Law and Mr. Dixon failed to exercise the skill and knowledge ordinarily possessed by attorneys in similar situations.

105. The Security Agreement provided that Plaintiffs would receive a perfected security interest in the Agreed Collateral.

106. The collateral description in the Financing Statement provided that the collateral taken to secure the payment of the Notes, was:

> All of the assets of (i) the Debtor [BLG], and (ii) all subsidiaries of Debtor (including Blank Label Group, Inc., a Delaware corporation and Ratio Clothing, LLC, an Ohio limited liability company), subject to the the [*sic*] U.S. Small Business Administration's lien dated June 28, 2020, including their respective personal property, whether presently existing or hereafter created or acquired…

107. Dixon Law and Mr. Dixon failed to achieve a security interest, much less a perfected security interest, in the Agreed Collateral.

108. Dixon Law and Mr. Dixon failed to perfect a security interest in the Agreed Collateral because there were no security agreements authenticated by any entity other than BLG. The failure by Dixon Law and Mr. Dixon to obtain signed security agreements from Ratio, BlackLapel and Blank Label Group meant that there was no attachment of a security interest to any assets held by Ratio, and no attachment of a security interest to any assets held by BlackLapel or Blank Label Group.

109. Even if there was attachment for Ratio's assets, which there was not since there was no security agreement authenticated by Ratio, Dixon Law and Mr. Dixon failed to file a financing statement in Ohio. Instead, Dixon Law and Mr. Dixon filed the Financing Statement in Delaware despite the fact that Ratio was an Ohio limited liability company. As Ratio was an Ohio limited liability company, a financing statement should have been filed in Ohio. The Financing Statement filed in Delaware by Dixon Law and Mr. Dixon was thus ineffective to perfect any security interest in the Membership Interest and Ratio Assets.

110. Dixon Law and Mr. Dixon later attempted to correct their mistake, which ultimately failed. Approximately eight-months after the transaction closed, Dixon Law and Mr. Dixon filed the Ratio Financing Statement in Ohio. Nineteen

(19) days later, on March 8, 2023, Ratio filed for bankruptcy in Delaware. As the Ratio Financing Statement was filed within 90-days of Ratio's bankruptcy filing, it constituted an avoidable preference under § 547 of the federal Bankruptcy Code. Under applicable law, when a security interest is avoided as a preferential transfer, the bankruptcy estate for Ratio is restored to the financial condition it would have had had the transfer (i.e., the recording of the Ratio Financing Statement) never occurred.

111. Although both BlackLapel and Blank Label Group were Delaware corporations, Dixon Law and Mr. Dixon failed to file a financing statement against them as "debtors" in Delaware. Instead, the only "debtor" identified in the Financing Statement filed by Dixon Law and Mr. Dixon in Delaware was BLG. While the Financing Statement prepared and filed by Dixon Law and Mr. Dixon in Delaware refers to "Blank Label Group, Inc." that reference only appears in the "Collateral" description. Because financing statements are indexed by the debtor's name and because perfection is achieved through the filing of a financing statement, the reference to "Blank Label Group, Inc." in the "Collateral" description of the Financing Statement was deficient to perfect a security interest in the assets of Blank Label Group.

112. Dixon Law and Mr. Dixon later attempted to correct their mistake, which ultimately failed. Approximately eight-months after the transaction closed,

Dixon Law and Mr. Dixon filed the Amended Financing Statement in Delaware to include as "debtors" BlackLapel and an entity identified as "Blank Label, Inc." Nineteen (19) days later, on March 8, 2023, BlackLapel and Blank Label Group filed for bankruptcy in Delaware. As the Amended Financing Statement was filed within 90-days of BlackLapel's bankruptcy filing, it constituted an avoidable preference under § 547 of the federal Bankruptcy Code. Under applicable law, when a security interest is avoided as a preferential transfer, the bankruptcy estate for BlackLapel is restored to the financial condition it would have had had the transfer (i.e., the recording of the Amended Financing Statement) never occurred. Further, because financing statements are indexed by the debtor's name and because perfection is achieved through the filing of a financing statement, the reference to "Blank Label, Inc." as the "debtor" in the Amended Financing Statement was insufficient to perfect a security interest in the assets of Blank Label Group. Even if the Amended Financing Statement was not insufficient as to Blank Label Group, which it was, the transfer of the security interest would have constituted an avoidable preference under § 547 of the federal Bankruptcy Code.

113. Dixon Law and Mr. Dixon failed to obtain control agreements for the benefit of Plaintiffs and, as a direct result, Dixon Law and Mr. Dixon failed to obtain a perfected security interest in deposit accounts belonging to Ratio, BLG, BlackLapel and Blank Label Group.

114. Dixon Law and Mr. Dixon failed to obtain a perfected security interest for Plaintiffs in copyrights belonging to Ratio, BLG, BlackLapel and Blank Label Group by failing to file a record of the security interest with the United States Copyright Office.

115. Dixon Law and Mr. Dixon failed to order or obtain a UCC search before the closing of the transaction, or make the receipt of such a search a condition of closing. Had Dixon Law and Mr. Dixon performed said search, they would have learned, among other things, the following: (i) that Ratio was organized under the laws of Ohio; (ii) that BLG, BlackLapel and Blank Label Group were organized under the laws of Delaware; and (iii) that the Small Business Administration ("SBA"), which purportedly held a first priority lien against the Membership Interest and Ratio Assets, had filed its financing statement in Colorado, not Ohio, and, therefore, failed to properly perfect its security interest. The failure by the SBA to properly perfect its security interest meant that had Dixon Law and Mr. Dixon filed a financing statement against Ratio in Ohio that Plaintiffs would have held a first-priority lien against the Membership Interest and Ratio Assets.

116. Dixon Law and Mr. Dixon failed to conduct a reasonable investigation into the ownership structure of BLG, BlackLapel and Blank Label Group.

117. Had Dixon Law and Mr. Dixon conducted a reasonable investigation they would have discovered, among other things, the bankruptcy filed by Blank Label Group in the bankruptcy court for the District of Massachusetts on May 26, 2020 in a case styled *In re Blank Label Group, Inc.*, Case No. 20-11201 (Bankr. D. Mass.).

118. Further, had Dixon Law and Mr. Dixon conducted a reasonable investigation they would have discovered BlackLapel merged with a subsidiary of Blank Label Group and became a wholly-owned subsidiary of Blank Label Group.

119. Further, had Dixon Law and Mr. Dixon conducted a reasonable investigation they would have discovered Blank Label Group held all of the equity and membership interests in BlackLapel and BLG.

**J. Damages Caused by the Negligence of Dixon Law and Mr. Dixon**

120. Had Dixon Law's and Mr. Dixon's representation met the appropriate standard of care, Plaintiffs' security interests would have attached and been perfected.

121. As secured creditors, Plaintiffs would have had increased leverage in Debtors' bankruptcy. The leverage would derive from the fact that, in bankruptcy, a properly perfected security interest yields a secured claim which is equal to the value of the collateral, or the amount of the secured creditor's debt, whichever is less. *See* 11 U.S.C. § 506.

122. As secured creditors, Plaintiffs could have "credit bid" the amount their debt as part of a sale the Debtor's assets conducted pursuant to § 363 of the federal Bankruptcy Code. The effect of a "credit bid" is to allow the holder of a secured claim to bid at the sale of property that is subject to its lien and, if it purchases the property, offset its secured claim against the purchase price of the property.

123. Because of the negligence of Dixon Law and Mr. Dixon, Plaintiffs were not able to "credit bid" the amount of their claim for the Agreed Collateral. Not being able to "credit bid" the amount of their claim meant that Plaintiffs would be required to come out-of-pocket with other financial consideration (i.e., cash) to bid on the Agreed Collateral.

124. The Agreed Collateral sold for at least $1,250,000, an amount in excess of the maximum amount payable on the Notes. For that reason, the Notes would have been paid in full had Plaintiffs held a perfected security interest.

125. As direct a result of the professional negligence committed by Dixon Law and Mr. Dixon, Plaintiffs have suffered economic damages in an amount to be proven at trial but no less than $987,199.55.

## V.
## FIRST CAUSE OF ACTION
## (PROFESSIONAL NEGLIGENCE)

126. Plaintiffs re-allege and incorporate paragraphs 1 through 125 above as if fully set forth herein.

127. In acting as counsel for Plaintiffs, the Dixon Firm and Mr. Dixon failed to provide those services in accordance with the standards of care applicable to attorneys practicing law in Colorado.

128. In acting as counsel for Plaintiffs, the Dixon Firm and Mr. Dixon failed to provide those services in accordance with the standard of care exercised by other attorneys of ordinary skill and capacity in the same field.

129. The foregoing professional negligence by the Dixon firm and Mr. Dixon caused damages to Plaintiffs in an amount to be proven at trial.

## JURY DEMAND

130. Plaintiffs demand a jury trial pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor as follow:

1. Judgment in their favor and against Dixon Law and Mr. Dixon in an amount to be proven at trial but no less than $987,199.55;

2. Attorneys' fees and costs;

3. Prejudgment interest at the Default Interest rate set forth in the Notes or, alternatively, at the rate of prejudgment rate of interest as determined by the Court;

4. Costs of suit; and

5. Such other and further relief as this Court deems just and proper.

Dated: November 27, 2024

**ITO LAW GROUP, P.C.**

By: /s/ Peter W. Ito

Peter W. Ito
1550 Larimer Street, Suite 667
Denver, CO 80202
Telephone: (720) 281-5294
Email: peter@itolawgroup.com

**Attorneys for Eric Powell and Richard Gray**